# Exhibit A

Complaint and Summons, as served

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ex rel. Michael G. Nerheim, State's Attorney of Lake County, Illinois; | ) |
| LAKE COUNTY, ILLINOIS; | ) |
| MICHAEL G. NERHEIM, as State's Attorney of Lake County, Illinois. | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) |
| vs. | ) |
| | ) |
| JUUL LABS, INC., a Delaware Corporation, | ) |
| | ) |
| ———— | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

Case No: 19L00000571

PLEASE SERVE: JUUL LABS, INC.
c/o CT Corporation System
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

## SUMMONS

To each defendant:

     You are summoned and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, in the office of the Clerk of this Court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

     E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

To the officer:

     This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed.

171-138 Rev 07/18

This summons may not be served later than 30 days after its date.

8/16/2019

WITNESS _____

*Erin Cartwright Weinstein*

ERIN CARTWRIGHT WEINSTEIN,
Clerk of Court

MB

Prepared by:
Name: Brian H. Eldridge                                    Pro Se ☐

Address: 22 W. Washington Street, Suite 1600

City: Chicago                              State: IL

Phone: 312.955.0545              Zip Code: 60602

ARDC #: 6281336

Fax: 312.971.9243

E-mail address: beldridge@hmelegal.com

(If service by facsimile transmission will be accepted, the telephone number of the plaintiff or plaintiff's attorney's facsimile machine is additionally required.)

Date of Service _____, 20_____ (to be inserted by officer on copy left with defendant or other person).

171-138 Rev 07/18

| | | |
|---|---|---|
| | ( Service and return ....................................... :$ | _____ |
| **SHERIFF'S FEES** | ( Miles_____ ....................................... $ | _____ |
| | ( Total ....................................... $ | _____ |

_____

Sheriff of _____ County

I certify that I served this summons on defendants as follows:

(a)-(Individual defendants – personal):
(The officer or other person making service, shall (a) identify as to sex, race and approximate age of the defendant with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of the day when the summons was left with the defendant).

_____

_____

_____

_____

(b)-(Individual defendants – abode):
By leaving a copy of the complaint at the usual place of each individual defendant with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons. (The officer or other person making service, shall (a) identify as to sex, race and approximate age of the person, other than the defendant, with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of day when the summons was left with such person):

_____

_____

and also by sending a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his usual place of abode, as follows:

| Name of defendant | Mailing Address | Date of mailing |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(c)-(Corporate defendants):
By leaving a copy and a copy of the complaint with the registered agent, officer or agent of each defendant corporation, as follows:

| Defendant corporation | Registered agent, officer or agent | Date of |
|---|---|---|
| Service | | |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(d)-(Other service):

_____

_____

_____

_____ Sheriff of _____ County

By: _____

(Deputy)

171-138 Rev 07/18

9-10-19  12:43

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ex rel, Michael G. Nerheim, State's Attorney of Lake County, Illinois; ) | |
| LAKE COUNTY, ILLINOIS; ) | |
| MICHAEL G. NERHEIM, as State's Attorney of Lake County, Illinois, ) | |
| ) | |
| ) | |
| ) | |
| Plaintiff(s) ) | |
| VS. ) | |
| ) | |
| JUUL LABS, INC., a Delaware Corporation, ) | |
| ) | |
| Defendant(s) ) | |

Case No: 19L00000571

PLEASE SERVE: JUUL LABS, INC.
c/o CT Corporation System
818 West Seventh Street, Suite 930
Los Angeles, CA  90017

## SUMMONS

**To each defendant:**

You are summoned and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, in the office of the Clerk of this Court, within 30 days after service of this summons, not counting the day of service.  If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.  If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

**To the officer:**

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so indorsed.

171-138 Rev 07/18

This summons may not be served later than 30 days after its date.

8/16/2019

WITNESS _____

*Erin Cartwright Weinstein*

**ERIN CARTWRIGHT WEINSTEIN,**
Clerk of Court                    MB

Prepared by:
Name: Brian H. Eldridge _____   Pro Se ☐

Address: 22 W. Washington Street, Suite 1600 _____

City: Chicago _____   State: IL _____

Phone: 312.955.0545 _____   Zip Code: 60602 _____

ARDC #: 6281336 _____

Fax: 312.971.9243 _____

E-mail address: beldridge@hmelegal.com _____

(If service by facsimile transmission will be accepted, the telephone number of the plaintiff or plaintiff's attorney's facsimile machine is additionally required.)

Date of Service _____, 20_____ (to be inserted by officer on copy left with defendant or other person).

171-138 Rev 07/18

|  | ( Service and return ............................................. $ |  |
|---|---|---|
| **SHERIFF'S FEES** | ( Miles_____ ............................................. $ |  |
|  | ( Total ............................................. $ |  |

_____

Sheriff of _____ County

I certify that I served this summons on defendants as follows:

(a)-(Individual defendants – personal):

(The officer or other person making service, shall (a) identify as to sex, race and approximate age of the defendant with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of the day when the summons was left with the defendant).

_____
_____
_____
_____

(b)-(Individual defendants – abode):

By leaving a copy of the complaint at the usual place of each individual defendant with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons.  (The officer or other person making service, shall (a) identify as to sex, race and approximate age of the person, other than the defendant, with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of day when the summons was left with such person).

_____
_____
_____

and also by sending a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his usual place of abode, as follows:

| Name of defendant | Mailing Address | Date of mailing |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(c)-(Corporate defendants):

By leaving a copy and a copy of the complaint with the registered agent, officer or agent of each defendant corporation, as follows:

| Defendant corporation Service | Registered agent, officer or agent | Date of |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(d)-(Other service):

_____
_____
_____

_____ Sheriff of _____ County

By: _____

(Deputy)

**FILED**
**8/13/2019 11:56 AM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ex rel. Michael G. Nerheim, State's Attorney of Lake County, Illinois; LAKE COUNTY, ILLINOIS; MICHAEL G. NERHEIM, as State's Attorney of Lake County, Illinois<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>JUUL LABS, INC., a Delaware corporation,<br><br>    *Defendant.* | Case No.  19L 00000571<br><br>**NOTICE**<br>**PURSUANT TO LCR - 2-2.14**<br>THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE IN COURTROOM _____ ON _____ AT _____ A.M./P.M.<br>FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED. |

---

## COMPLAINT

---

Plaintiffs bring this Complaint and Demand for Jury Trial against Defendant JUUL Labs, Inc., and alleges as follows:

### INTRODUCTION

1.    The tobacco industry has preyed on America's youth for decades, aggressively promoting tobacco products using tactics designed to appeal to children. The goal of its marketing campaign was simple: recruit new users at a young age, addict them, and make them life-long patrons. But while big tobacco companies reaped billions of dollars in profits off addicting America's youth to cigarettes, smoking became a public health epidemic, leading to widespread death and disease,

1

pain and suffering, and massive amounts of money in healthcare costs. Beginning in the late 1990s, adolescent smoking rates finally began to fall. This was not, of course, because nicotine became any less addictive or because tobacco companies stopped preying on America's youth. Instead, it took years of legal battles and government regulation to blunt big tobacco's reach into youth populations.

2.     While falling addiction rates would be viewed as a remarkable accomplishment by any objective measure, JUUL saw it as an opportunity. In particular, JUUL sought to fill the void left by big tobacco by creating a new-age electronic cigarette, the "JUUL", that is so addictive it led to the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance used in the U.S."[1] By utilizing new technologies and social media, JUUL picked up right where the big tobacco companies left off.

3.     First, JUUL developed a nicotine-dispensing product even more addictive than traditional cigarettes. Nicotine itself affects brain development, attention, cognition, and raises the risk of addiction to other dangerous drugs. Nicotine acts directly on the neurotransmitter dopamine, causing a dependence similar to heroin and other deadly opiates that have similarly decimated American communities. Due to JUUL's innovative nicotine delivery system, the nicotine contained in a JUUL is even more potent than the nicotine in traditional cigarettes, which is even more pronounced when used by adolescents. By creating a high-

---

[1] Vaping Surges: Largest Year-to-Year Increase in Substance Use Ever Recorded in the U.S. for 10th and 12th Grade Students, University of Michigan Institute for Social Research (Dec. 17, 2018), https://isr.umich.edu/news-events/news-releases/national-adolescent-drug-trends-in-2018/.

quantity, rapid, nicotine delivery system, JUUL has turned a generation of adolescents into addicts, constantly craving their next hit off their JUUL. And while traditional cigarette smoke leaves an odor and is easily detectible, the JUUL device comes in candy flavors and produces a vapor, so it can be smoked almost anywhere and easily hidden from teachers, parents, and peers.

4.      Next, JUUL launched a massive online and social media advertising campaign. Because social media platforms, for example, are primarily used by adolescents, JUUL was able to easily target and manipulate youth by using advertisements designed to fulfill powerful psychological needs like popularity, peer acceptance, and a positive self-image. JUUL's ads consistently used attractive young models smoking JUULs and partying in provocative, sexual settings to lure the next generation of nicotine addicts. Additionally, JUUL saturated social media feeds with advertisements, hashtags, and paid influencers—all promoting JUUL's sleek new product.

5.      JUUL's predatory strategies were so obvious the United States Food and Drug Administration was compelled to open its own investigation into JUUL's youth targeting. In response, JUUL "shut down" its social media accounts and promised to stop selling flavored nicotine pods. JUUL's promises, however, have proven empty. Its social media campaign remains active and JUUL still sells flavored nicotine. Moreover, to a large extent the damage is already done. JUUL's deceptive and negligent practices have already led to widespread adolescent addiction to JUUL's

dangerous product which can only be undone through expensive anti-addiction and cessation treatment.

6.      Now that JUUL controls nearly 75% of the e-cigarette market, it is changing course and attempting to brand itself as a "safe" alternative to smoking and as a means to stop smoking traditional cigarettes. JUUL's attempt to rewrite its history is nothing more than a façade, promulgating a false narrative designed to lure adults already addicted to nicotine and vulnerable children who have no understanding of the lifelong, adverse health consequences these devices impose. What's more, in December 2018, Altria, the corporate conglomerate formerly known as Phillip Morris—one of the world's largest producers and marketers of tobacco cigarettes—purchased a 35% stake in JUUL for approximately $12.8 billion. As such, JUUL is now backed, owned, emboldened, and beholden to big tobacco.

7.      This complaint seeks relief for the State of Illinois and the millions of children and teenagers who call it home. JUUL has caused a public health crisis that has already devastated millions of children's and family's lives. Accordingly, the People of the State of Illinois, by and through Lake County State's Attorney Michael G. Nerheim, seek civil penalties and all appropriate injunctive relief to address, remedy, and prevent harm to Illinois residents resulting from JUUL's misconduct.

## PARTIES

8.      Plaintiffs bring this action in the public interest for and on behalf of the People of the State of Illinois and Lake County.

9.      Defendant JUUL Labs, Inc. is a corporation existing under the laws of

4

the State of Delaware, with its principal place of business located at 560 20th Street,

San Francisco, California 94107. JUUL was formerly known as Ploom Products, Inc.

and Pax Labs, Inc.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter pursuant to Article VI, Section 9 of the Illinois Constitution.

11. This Court has jurisdiction over JUUL pursuant to 735 ILCS 5/2-209 because it conducts business transactions in Illinois, has committed tortious acts in Illinois, and has transacted substantial business in Illinois that caused harm in Illinois, including business that is the subject matter of this complaint.

12. Venue is proper in this court under 735 ILCS 5/2-101, as the transactions and occurrences that form the basis for this complaint occurred, in part, in Lake County.

## FACTUAL ALLEGATIONS

### I.   History of Tobacco Litigation and Regulation Leading to the Prohibition of Advertising and Marketing to Minors

13. The tobacco industry as a whole has a sordid history of deceptive marketing that made it one of the most profitable industries in the world. Since the late 19th and early 20th Century, tobacco companies have made use of advertisements to market their products to adolescent users. Over the last 75 years, however, litigation and regulation have effectively led to the prohibition of advertising and marketing cigarettes to minors.

14.     Beginning in the 1950s, individuals began bringing personal injury and wrongful death claims against big tobacco companies. In the 1960s, the U.S. Surgeon General began reporting on the dangers associated with smoking. In 1965, in response to the U.S. Surgeon General's reports, the United States Congress passed the Federal Cigarette Labeling and Advertising Act, requiring a surgeon general's warning on cigarette packs. In 1971, all broadcast advertising for cigarettes was banned. Despite these efforts, smoking remained rampant.

15.     In March 1994, the U.S. Surgeon General reported on the impact tobacco advertising and promotional activities has on tobacco consumption by youths and, among other things, found that the use of human models and cartoon characters in cigarette advertisements conveyed themes that appealed to young people.[2] In a separate 1994 consensus study by the National Academies of Science, Engineering, and Medicine, various themes used by tobacco companies to market to children were studied. The report ultimately recommended forbidding the use of images and pictures which encouraged adolescent use, and allowing only text without slogans, scenes, or colors, as these marketing techniques encouraged adolescent use.[3]

16.     From 1994 through 1997, Attorneys General across the United States filed lawsuits against the tobacco industry, including the Attorney General from Illinois and also Attorneys General from Alabama, Alaska, California, Colorado,

---

[2] Preventing Tobacco Use Among Young People: A report of the Surgeon General, Centers for Disease Control and Prevention (Mar. 11, 1994), https://www.cdc.gov/mmwr/pdf/rr/rr4304.pdf.

[3] Growing up Tobacco Free: Preventing Nicotine Addiction in Children and Youths (1994), https://www.ncbi.nlm.nih.gov/books/NBK236761/.

Connecticut, Florida, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Texas, Utah, Washington, and West Virginia.

17.     In 1998, a settlement agreement was reached, known as the Tobacco Master Settlement Agreement ("MSA"), that required cigarette companies to pay $368.5 billion over 25 years to compensate states for the costs of treating smoking-related illness, to finance nationwide anti-smoking programs, and to underwrite healthcare for millions of uninsured children. The settlement agreement was designed to "forever change the way cigarettes are marketed in the United States" by banning various marketing practices that targeted individuals under 18 years-old.

18.     In 2006, the United States District Court for the District of Columbia found that major U.S. cigarette companies, including Phillip Morris (now Altria, JUUL's largest shareholder), had violated the MSA by: (1) fraudulently claiming that "low tar" and "light" cigarettes were less harmful when the companies knew they were not and (2) by marketing their products to children.[4]

19.     In 2009, President Barack Obama signed into law the Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), limiting the use of color on tobacco advertisements; limiting advertising in publications with significant teen readership to black text on white background only; establishing 18 as a federal nationwide

---

[4] *See United States v. Phillip Morris USA, Inc.*, 9 F. Supp. 2d 1 (D.D.C. 2006).

minimum age for legal cigarette and smokeless tobacco sales; and prohibiting terms such as "light," "mild," and "low-tar" on tobacco product packages and advertisements. When drafting the FSPTCA, Congress revealed a number of interesting findings, including:

- Reducing the use of tobacco by minors by 50% would prevent well over 10,000,000 children from becoming regular, daily smokers, saving over 3,000,000 of them from premature tobacco-induced death. Such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced health care costs;

- Advertising, marketing, and promotion of tobacco products have been directed to attract minors to using tobacco products, and these efforts have resulted in increased use of such products by minors;

- The use of tobacco products in motion pictures and other mass media glamorizes its use for minors and encourages them to use tobacco products;

- Minors are more susceptible to advertisements promoting reduced cigarette prices; and

- Minors are generally more influenced by tobacco marketing than adults.

20.    Thanks to the above-referenced litigation and regulation, big tobacco's advertising practices of traditional cigarettes had been severely restrained. As a result, for example, 12th grade smoking rates plummeted from 24.6% in 1997 to 5.5% in 2015.[5] Unfortunately, however the same cannot be said for the recent rise of electronic smoking devices.

---

[5]    Adolescents and Tobacco: Trends, U.S. Department of Health and Human Services, https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html.

II.     **Electronic Nicotine Delivery Systems and E-Cigarettes**

    *A.*     *The Rise of Electronic Nicotine Delivery Systems and E-Cigarettes*

    21.     Electronic nicotine delivery systems ("ENDS") are hand-held products designed to deliver nicotine and other substances to a user in the form of vapor. ENDS typically consist of a battery-powered heating element, a replaceable cartridge that contains high levels of nicotine, and an atomizer. When heated, the liquid contents of the cartridge are converted into a vapor that the user inhales, delivering nicotine rapidly into their bloodstreams.

    22.     ENDS come in many shapes and sizes and are colloquially referred to as vapes, vaporizers, vape pens, weed pens, hookah pens, electronic cigarettes, e-cigarettes, e-cigs, and e-pipes. ENDS may be manufactured to look like conventional cigarettes, cigars, pipes, pens, and USB flash drives, while others resemble canteens or portable hard drives (sometimes referred to as "tank systems"). The use of ENDS to inhale nicotine-infused vapor is commonly referred to as "vaping," "vaporizing," or—most recently and popularly—"JUULing."

    23.     In 2014, the e-cigarette market was worth approximately $2.76 Billion, in 2015, it grew to $4.55 Billion, and in 2016, the market value raised to $7.1 Billion. Recent projections predict the e-cigarette industry as a whole will reach a valuation of $44.61 Billion by 2023.

    24.     According to the British Journal of Medicine, "the increase in JUUL use among adolescents . . . [is] almost entirely responsible for the overall growth in the

9

[United States] vaping market."[6]

## B. Chemicals contained in ENDS and E-Cigarettes

### i. Nicotine

25.     Nicotine is highly-addictive and acts directly on the neurotransmitter dopamine, causing a dependence similar to heroin and other deadly opiates. Nicotine's potency is even more pronounced when used by adolescents, affecting brain development, attention, cognition, and raising the risk of addiction to other drugs. The addictive nature of nicotine is widely known. A 2007 study found that nicotine was the third most addictive substance in the world behind heroin and cocaine.

26.     Nicotine's highly addictive nature stems from its effects on the central nervous system. When ingested, nicotine can accelerate blood pressure and pulse, affect mood, increase circulating levels of hormones and neurotransmitters, increase metabolic rate, constrict blood vessels, and cause muscle relaxation. Once nicotine enters the body through inhalation, it is distributed quickly through the bloodstream and crosses the blood-brain barrier, reaching the brain within 10-20 seconds after inhalation. The acute effects of nicotine, though, are fleeting and dissipate in a few minutes. This causes the user to continue dosing frequently throughout the day to maintain the drug's pleasurable effects and prevent withdrawal.

27.     There is a frightening overlap between the effects of nicotine and opiates on dopamine signaling with the brain's rewards centers.[7] Studies have shown the

---

[6] https://www.bmj.com/content/365/bmj.l2219
[7] Opiate And Nicotine Have Surprisingly Similar Effect On Brain's Reward System, Science Daily (Feb. 19, 2008), https://www.sciencedaily.com/releases/2008/02/080212171131.htm.

severity of tobacco and nicotine addiction, equating its grip on the individual to that of heroin, as both nicotine and opiates act on the same structures and receptors in the human brain. *Id.*

28.     Nicotine has the potential to adversely affect the heart (ischemia and myocardial dysfunction), eyes (macular degeneration and cataracts), reproductive system (irregular menstrual cycles), lungs (asthma and emphysema), kidneys (chronic kidney disease), and has teratogenic side-effects (cognitive deficits and behavioral abnormalities). Exposure to nicotine, even from non-traditional tobacco sources such as nicotine e-cigarettes, produces an increased risk of cardiovascular disease, an increased risk of peripheral arterial disorders due to the increase in blood pressure and its constrictive effect on blood vessels, and an increased risk of stroke.

29.     The adolescent brain is exceptionally more vulnerable to the addictive effects of nicotine because the circuits of the brain underlying pleasure and the pursuit of novel and enjoyable experiences develop faster than the circuits in the brain that promote decision-making, impulse control, and rational thinking. Compared with adults, adolescents are generally more motivated by rewards, are less averse to risks, and are more influenced by peers. The same applies to the estimation of health risks relating to smoking—adolescents have a more optimistic attitude regarding their smoking behavior, believing that they "could smoke for a few years and then quit if they wished."[8]

---

[8] Arnett JJ. Optimistic bias in adolescent and adult smokers and nonsmokers. *Addict Behav.* 2000; 25(4): 625-32.

30.     Among adolescents, the use of nicotine is a psychiatric problem that cultivates addictive behaviors by rewiring and interfering with brain development. Several studies indicate that smoking and nicotine exposure during adolescence is associated with disturbances in working memory and attention, as well as reduced prefrontal cortex activation.[9] Studies show that adolescent tobacco and nicotine use are associated with later risk of developing mental and behavioral problems such as major depressive disorder, agoraphobia, panic disorder, addiction to other substances, antisocial personality disorder, and/or academic.[10] Not only does the use of nicotine by adolescents result in a greater level of addiction to nicotine itself, but it increases vulnerability to initiation and subsequent addiction to other drugs.

31.     Simply put, the adolescent brain is more vulnerable to the effects of nicotine than the adult brain. Adolescents progress faster to nicotine dependence than adults, find nicotine more rewarding, underestimate the risks of smoking, and are more influenced by smoking behavior in their social milieu. Dr. Sharon Levy, director of the Adolescent Substance Use and Addiction Program at Boston Children's Hospital, called the popularity of teen vaping an "entirely predictable problem," given adolescents' vulnerability to nicotine. Levy has treated numerous "vape-addicted"

---

[9] Jacobsen LK, Krystal JH, Mencl WE, Westerveld M, Frost SJ, Pugh KR. Effects of smoking and smoking abstinence on cognition in adolescent tobacco smokers. Biological Psychiatry. 2005;57:56–66; Musso F, Bettermann F, Vucurevic G, Stoeter P, Konrad A, Winterer G. Smoking impacts on prefrontal attentional network function in young adult brains. Psychopharmacology (Berl) 2007;191:159–169.

[10] Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortext Neuronal Network Function, Cold Spring Harb Perspect Med. (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069.

adolescents in her program, showing psychiatric symptoms rarely seen with traditional cigarettes or among adults.

> ii. *Other chemicals and health issues associated with ENDS and e-cigarettes*

32.     Along with nicotine, e-cigarettes and vaping introduce other foreign substances into the lungs.

33.     In examining the vapor emitted from e-cigarettes, researchers have detected significant levels of at least 31 harmful chemical compounds, including propylene glycol, glycidol, formaldehyde, acetaldehyde, and acrolein—all either carcinogens or respiratory irritants.[11]

34.     The prolonged consumption of these chemicals is likely to produce chronic obstructive pulmonary disease (just like traditional cigarette smoke); immune responses associated with inflammatory lung diseases; constrict peripheral airways; impact the central nervous system, behavior, and spleen; and cause throat and mouth irritation, cough, nausea, and vomiting.

35.     JUUL fails to disclose that its products contain any of the above chemicals or the associated adverse health effects.

---

[11] Study identifies two additional carcinogens not previously reported in e-cigarette vapor, Lawrence Berkeley National Laboratory (July 27, 2016), https://phys.org/news/2016-07-additional-carcinogens-previously-e-cigarette-vapor.html.

## III.   JUUL

### A.   Background

36.   JUUL has the largest market share of any e-cigarette in the United States. From 2016 to 2017, JUUL's sales increased 641%, rising from 2.2 million devices sold in 2016 to 16.2 million devices in 2017, giving JUUL 46.8% of the e-cigarette market. By 2018, JUUL's share of the market rose to 75.8%. JUUL is currently valued at over $38 Billion. Figure 1 below depicts various e-cigarette manufactures' market share between 2014 to 2018.



*Figure 1: E-Cigarette Market Share 2014-2018*

37.     As shown in Figure 2, the JUUL e-cigarette has a rechargeable battery and heating element, which work together to heat the pre-filled JUUL pods.



*Figure 2: The JUUL device and accompanying JUUL Pods*

38.     The pre-filled JUUL Pods contain JUUL's patented nicotine solution, which slides into the end of the JUUL device. These JUUL pods come in a variety of flavors, such as Virginia Tobacco, Classic Tobacco, Mint (formerly Cool Mint), Menthol, Fruit (formerly Fruit Medley), Mango, Cucumber (formerly Cool Cucumber), and Crème (formerly Crème Brûlée).

39.     The rectangular JUUL e-cigarette device consists of an aluminum shell, battery, a magnet for the USB-charger, a circuit board, an LED light, and a pressure sensor. The JUUL pod is a plastic enclosure containing 0.7 milliliters of JUUL's nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery activates the heating element which converts the nicotine solution in the JUUL pod into a vapor. The light embedded in the JUUL device is a battery level indicator and lights up in a "party mode" display of colors when waved around.

40.     JUUL obtained a patent for a nicotine salt liquid formulation for generating an inhalable aerosol in an electronic cigarette (Patent No. 9,215,895 ("the JUUL Patent")). JUUL's use of an aerosol, rather than a flame, to activate its nicotine solution results in a quick powerful burst of nicotine which causes users to feel the rapid onset of the nicotine upon inhalation. This mechanism also makes its nicotine exceedingly more addictive.[12]

41.     Nicotine salts are created by combining nicotine with an organic acid which allows manufacturers to pack more nicotine into their products, masks nicotine's naturally unpleasant taste, and allows the drug to be absorbed by the body quicker.[13]

42.     The JUUL Patent included a blood plasma study comparing the pharmacokinetic effects of nicotine benzoate (nicotine salts) through an e-cigarette to nicotine through a traditional cigarette. The study concluded that:

- nicotine absorption through the e-cigarette is between 1.25 and 2.7 times faster than traditional cigarettes;

- e-cigarettes deliver higher amounts of nicotine at a faster rate than a traditional cigarette; and

- because of JUUL's method of nicotine absorption, JUUL's nicotine solution would still be more addictive than traditional cigarettes even with lower concentrations.[14]

43.     The concentration of nicotine, however, is not low, especially compared to traditional cigarettes. JUUL delivers doses of nicotine that are several times

---

[12] https://www.nytimes.com/2018/04/24/health/fda-e-cigarettes-minors-JUUL.html?module=inline.

[13] https://www.cnn.com/2019/01/17/health/vaping-ecigarettes-kids-teens-brains-fda/index.html.

[14] https://patents.google.com/patent/CA2909967A1/en.

higher than those allowed in traditional cigarettes. Blood test results in JUUL's 2014 patent application show that JUUL's nicotine solution delivers more nicotine to the bloodstream than a traditional cigarette, creates a peak nicotine blood concentration that is 36% higher than a traditional cigarette, and increases the heart rate faster than a traditional cigarette.

44.     While touted as being safer than traditional cigarettes, studies have actually shown *higher* levels of cotinine—a breakdown product of nicotine—in the urine of adolescent vapers than had been reported in prior research of adolescent cigarette smokers.[15]

45.     Corinne Graffunder, DrPH, the director of Centers for Disease Control and Prevention's Office on Smoking and Health, has stated, "[t]here are no redeeming benefits of e-cigarettes for young people . . . The use of certain USB-shaped e-cigarettes is especially dangerous among youth because these contain extremely high levels of nicotine, which can harm the developing adolescent brain."[16]

46.     The U.S. Surgeon General, Jerome Adams, stated that JUUL's liquid nicotine mixture is specially formulated to give a smoother, more potent nicotine buzz that "can promote dependence in just a few uses."[17]

**B.     JUUL's Misleading and Fraudulent Statements Regarding its Product**

47.     Throughout its history, JUUL has repeatedly compared the contents of

---

[15] https://www.cnn.com/2019/01/17/health/vaping-ecigarettes-kids-teens-brains-fda/index.html

[16] https://www.cdc.gov/media/releases/2018/p1002-e-Cigarettes-sales-danger-youth.html.

[17] https://chicago.suntimes.com/business/juul-teen-vaping-us-surgeon-general.

its pods to traditional tobacco products. Prior to JUUL's release in June 2015, PAX

(JUUL's original name) released information about its product. Included in this

material was a "commissioned study" comparing JUUL's blood nicotine levels to

traditional combustion cigarettes and other e-cigarettes. According to JUUL, the

results were as follows:



*Figure 3: Pre-release product information comparing
nicotine levels to cigarettes*

48.    When JUUL's website debuted in 2015, it included a similar chart:



Data calculated by PAX Labs, Inc. based on clinical testing
* Based on typical cartridge-based e-cigarette with 24 mg/mL nicotine strength
Actual nicotine consumed may vary by user

*Figure 4: JUUL's website information comparing
nicotine levels to cigarettes*

49.    While the JUUL Patent indicates that JUUL's nicotine salt solution causes nicotine-blood levels approximately 30% *higher* than a traditional cigarette, the PAX and JUUL charts above indicate that JUUL delivers approximately 25% less nicotine to the blood than a cigarette, thereby creating the false impression that JUUL is less addictive than a traditional cigarette.

50.    JUUL's website and advertisements have continued to assert that each JUUL pod is designed to contain approximately 0.7mL with 5% nicotine by weight which, as JUUL asserts in Figure 5, is "approximately equivalent to 1 pack of cigarettes or 200 puffs."



*Figure 5: June 19, 2018 Tweet from JUUL Comparing JULL
to Traditional Cigarettes*

51.     JUUL's statements are false, materially misleading, and materially
omit the fact that it is not just the amount of nicotine that should be considered when
determining the product's narcotic effect, risk of addiction, and therapeutic use, but
the efficiency with which the product delivers nicotine into the bloodstream.

52.     Because JUUL's nicotine salts increase the rate and magnitude of blood
plasma nicotine compared to cigarettes, the risk of nicotine addiction and abuse is
higher for JUUL e-cigarettes than traditional cigarettes.

53.     Despite such knowledge—which is evidenced by its own patent—JUUL
has never warned or disclosed to consumers that JUUL pods' nicotine salt
formulation deliver an exceptionally potent dose of nicotine or that JUUL's nicotine

salt formulation deliver a more potent dose of nicotine than traditional cigarettes. In fact, JUUL has misled its customers into believing the opposite.

54.    Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings to its device or pods until forced to do so in August 2018 when the exterior packaging was changed to add: "WARNING: This product contains nicotine. Nicotine is an addictive chemical." While JUUL has finally begun to warn its consumers of the presence of nicotine, it still fails to disclose the unique and highly addictive attributes of the JUUL products, including that:

- the JUUL pods nicotine salt formulation delivers an exceptionally potent dose of nicotine;

- the JUUL devices deliver doses of nicotine that are several times higher than those allowed in traditional cigarettes;

- the efficiency with which the JUUL devices deliver nicotine into the bloodstream increases its addictiveness;

- it can be more addictive than traditional cigarettes; and

- the chemicals (including, but not limited to, nicotine) pose serious health risks, such as cancer, stroke, COPD, and other diseases commonly associated with traditional cigarettes.

55.    JUUL delivers significantly more nicotine than a pack of cigarettes—both per pack and per puff—exacerbating nicotine addiction and other adverse health effects associated with nicotine consumption when compared to cigarettes.

56.    Similarly, JUUL's pods and technology "delivers higher concentrations of nicotine than conventional e-cigarettes."[18]

---

[18] https://www.bmj.com/content/365/bmj.l2219

21

57.    Despite having actual and constructive knowledge of these facts, JUUL continues to fraudulently mislead its customers into thinking its product is safer and less addictive than traditional cigarettes.

58.    JUUL misrepresents the nicotine content of JUUL pods by representing them as 5% strength. However, JUUL pods contain more than 5% nicotine by volume and deliver it in a form that is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume, leading consumers to believe it contains less nicotine than other formulations as advertised as 6% nicotine, when JUUL pods in fact contain more nicotine than a solution that is 6% nicotine by volume.

59.    JUUL's "5% strength" statement misrepresents the most material feature of its product: the nicotine content.

**C.    JUUL's Targeted Advertising to Minors**

   *i.    JUUL's advertising strategy to appeal to youth was copied directly from Big Tobacco*

60.    Taking pages out of the tobacco industry's playbook, JUUL crafted its entire marketing strategy around practices that have been known to appeal directly to adolescent users. JUUL adopted the same themes used by big tobacco companies to glamorize smoking while downplaying its addictiveness and deleterious health effects. In fact, JUUL's founder—James Monsees—publicly admitted that JUUL looked at tobacco industry documents that were made public under the MSA. According to Monsees, "[The tobacco industry] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be

able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time."[19] In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisement and that [the Stanford Research into the Impact of Tobacco Advertising Project's] online tobacco advertising collection had been quite useful to them." *Id.* Unsurprisingly, JUUL's advertisements over the course of its existence have played to similar themes (depicted below) and bear a striking resemblance to those of traditional tobacco companies.

    **a.**    *Attractive women*



---

[19] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf

### b.   Relaxation




### c.   Social inclusion




### d.   Romance




24

### e.    *Flavors*



### f.    *New technologies and select terms (like "smart") to convey health and safety*





 

61.    As JUUL knew, these advertising strategies were known to cause youth smoking addiction. JUUL's use of these same marketing strategies have already, and threaten to continue, to reverse decades of progress in protecting youth from nicotine addiction.

    ii.    *JUUL's social media campaign*

62.    The goal of a social media campaign is to exploit existing social networks to produce brand awareness through online word-of-mouth. Because of the nature and speed of the internet, social media campaigns can rapidly reach a large number of people. The best social media campaigns turn customers into salespeople who then repeat company representations and talking points. While the effects of social media campaigns may appear organic, in reality, they are the result of carefully orchestrated corporate advertising.

63.    Studies show that teenagers tend to be on social media far more than adults:

- 95% of teenagers aged 13-17 have access to a smartphone.[20]

- 89% of teens are online either "almost constantly" or "several times a day" *Id.*

- On average, teens spend approximately 9 hours per day online.[21]

- 70% of teens use social media multiple times a day.[22]

- As of April 2018, 63% of teens age 13-14 and 78% of 15-17 utilized Instagram.[23]

64.    Advertisers are of course well aware of these statistics. "Smart marketers realize that digital-first Generation Zers present a unique opportunity to instill brand loyalty early. As one marketing director noted . . . when someone becomes a customer at a young age, they will spend three times as much over their lifetime."[24]

65.    Prior to the tobacco-related regulations and litigation discussed above, tobacco companies took full advantage of these known facts. Today, however, tobacco companies are prohibited from:

- Using colored text and backgrounds in any advertisements;

---

[20] http://www.pewinternet.org/2018/05/31/teens-social-media-technology-2018.

[21] https://www.washingtonpost.com/news/the-switch/wp/2015/11/03/teens-spend-nearly-nine-hours-every-day-consuming-media/?utm_term=.95a59dc01ead.

[22] https://www.commonsensemedia.org/social-media-social-life-infographic.

[23] http://www.statista.com/statistics/419372/us-teen-instagram-users-age-reach.

[24] https://www.forbes.com/sites/forbescommunicationscouncil/2018/07/03/why-gen-z-is-on-the-a-list-for-e-commerce-marketers/#4cfc8af2c7b4.

- Utilizing colored advertising in publications with significant teen readership;

- Using outdoor advertising such as billboards;

- Sponsoring events;

- Giving free samples;

- Paying any person to use, display, make reference to, or use as a prop any tobacco product in any media; and

- Paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

66.    JUUL and its marketing agency (Cult Collective), on the other hand, have exploited these marketing tactics now unavailable to tobacco companies.

67.    To announce its release in June 2015, JUUL and Cult Collective launched a multimillion-dollar "Vaporized" advertising campaign. Cult Collective has been described as being "devoted to giving brands a cult-like following".[25] The marketing agency advertises itself as "audience engagement experts" with the promise, "We can help you win a sustainable competitive advantage by applying proven cult brand principles that results in enviable levels of brand attachment and advocacy."[26] As part of its campaign to obtain "cult like followers," JUUL utilized images (such as Figure 6) depicting young and stylish models, bold colors, and memorable images, which in turn, promote idealized adolescents using JUUL products – a strategy blatantly aimed at a youth audience.

---

[25] https://www.forbes.com/sites/mnewlands/2016/09/26/join-the-engagement-advertising-cult-an-interview-with-cult-collectives-ryan-gill/#44bbee071016

[26] https://cultldn.com/



*Figure 6: Images from JUUL's Vaporized Campaign*

68.   As shown in Figure 7, the campaign's color scheme was similar to colors used by Natural American Spirit Cigarettes, a leading brand of cigarettes among teenagers.



*Figure 7: Comparison of American Spirit Cigarettes*
*and JUULs' Color Scheme*

69.   Instead of warning about the dangers of nicotine described above, the campaign utilized phrases such as "Smoking Evolved" to appeal to youth fascination with high-tech, cool products, like iPhones – which also have been characterized as

having a "cult like following."[27]



*Figure 8: Image from JUUL's 2015 Vaporized Campaign*

70.    JUUL promoted the campaign on Facebook, Instagram, and Twitter. A

report on the growth and marketing of the JUUL brand found that JUUL was one of

the first major retail e-cigarette brands to heavily rely on social media to market its

products:

> [O]ur study shows that the growth of JUUL was accompanied by
> innovative marketing across a variety of new media platforms. The
> marketing of other major retail e-cigarette brands, at least in their early
> stages, relied heavily on either advertising on TV (eg, Blu and Njoy) or
> promotional expenditures to retailers and consumers (eg, Vuse and
> MarkTen), or both. However, JUUL was one of the first major retail e-
> cigarette brands that relied heavily on social media to market and
> promote its products. In particular, we found the number of JUUL-
> related tweets was highly correlated with quarterly retail sales of JUUL.
> In addition to Twitter, JUUL was heavily marketed and promoted on
> Instagram and YouTube. The official JUUL account on Instagram, for

---

[27] https://www.forbes.com/sites/robinlewis/2014/09/02/how-apple-neurologically-hooked-its-customers/#57604f8ff001.

example, used a variety of marketing and promotional schemes to attract, engage with and retain followers. The account used artsy, professional-grade photographs to display its products and evoke lifestyle feelings such as relaxation, freedom and sex appeal. Those posts also heavily emphasized JUUL's variety of flavors.[28]

71.    As part of the 'Vaporized' campaign, JUUL sponsored at least 25 parties and events across the country. Again, JUUL failed to include any disclaimers about the dangers of nicotine in their invitations. Instead, the invitations (as shown in Figure 9) promoted youth focused imagery and live music.



*Figure 9: JUUL Product Launch Party Promotion*

72.    Cult Collective (JUUL's marketing agency), stated in its JUUL case study, "[w]e created ridiculous enthusiasm for the hashtag 'Vaporized'. . . [the campaign] aligned perfectly with those we knew would be our best customers."[29]

---

[28] https://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382.

[29] https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

Photographs from the JUUL launch events evidence who JUUL intended to be their best customers.

 

*Figure 10: Photos of JUUL Launch Party Attendees*

73.    At these launch events, JUUL regularly distributed free starter packs (*see* Figure 11*)*. As discussed above, the MSA forbids such conduct for tobacco companies as the practice fosters nicotine addiction. After acknowledging in October 2017 that it is unlawful to distribute free samples of its product at live events, JUUL began "charging" $1 for its product at "demo events."



*Figure 11: JUUL's Free and $1 New York Launch Party Promotion*

32

74.    As discussed above, the ultimate goal of a viral social media campaign, like 'Vaporized,' is to generate significant online buzz about your product such that your customers function as your spokesmen and promote your campaign through free online "word-of-mouth" advertising. "Hashtags"[30] are an essential tool in creating this effect as brands can join in on trending topics and engage with large numbers of readers. "Branded hashtags," that include the company's name, provide additional benefit as every time someone uses a branded hashtag, the company's social media presence increases.

75.    As evidenced in Figure 12, JUUL utilized hashtags throughout its existence. Commonly used JUUL hashtags include: #juul, #juulvapor, #switchtojuul, #vaporized.



*Figure 12: 2015 and 2017 Social Media Posts by JUUL with Commonly Used Hashtags*

---

[30] A hashtag is a type of metadata tag used on social media that makes it possible for others easily to find messages with a specific theme or content.

76.     In fact, comparing JUUL's first year on the market with its third, JUUL actually ramped up its hashtag use substantially. From October 17, 2018 to November 12, 2018, #juul alone added 23,676 posts (or an average of 877 posts per day). As of January 21, 2019, JUUL's premier hashtag (#juul) had 336,308 posts. Based on information and belief, JUUL was monitoring the uses of its hashtags and would have seen the tens of thousands of posts being made by minors, including those in Figure 13.



*Figure 13: Images tagged with "#JUUL"[31]*

---

[31] The images displayed in Figures 13 A-D were not necessarily created by JUUL, but were tagged with a JUUL created hashtag.

77.    JUUL knew kids were picking up on its campaign, yet at no time did JUUL take any steps to discourage the use of JUUL hashtags by teenagers.

78.    In fact, in an effort to further spread its viral marketing on social media and encourage online word-of-mouth advertising, JUUL utilized it official social media handle[32], "@juulvapor", to actively comment on and encourage JUUL social media posts.



*Figure 14: June 4, 2015 Social Media Post,*
*not Created by JUUL, but Promoted by JUUL*

79.    Figure 14 is an example of a social media post from a JUUL launch event. Based on information and belief, at least three of the individuals depicted were underage at the time the image was posted.

80.    In a separate instance, CNN found that JUUL's Instagram reposted a photo of a JUUL in an outstretched hand, taken by a 17-year old, subsequently giving

---

[32] In the online world, a "handle" is another word for a username.

him credit for the photo by tagging him in the description. As of December 19, 2018,
JUUL's Instagram account still followed the 17-year old.[33]

81.     JUUL also gained online exposure to adolescents on social media by
paying social media influencers to broadcast its product on newsfeeds. "Influencers"
are individuals who have developed large social media followings and are viewed as
trendsetters.[34] Generally, influencers post pictures of themselves using the product
they are promoting, along with a company-endorsed hashtag.

82.     JUUL actively engaged with social media influencers, even posting job
listings for influencers online. Figure 15 shows JUUL responding to an individual's
inquiry about being a JUUL "influencer" and directing them to apply on JUUL's
website.



*Figure 15: February 19, 2018 Tweet re JUUL's Search
for Social Media Influencers*

83.     Christina Zayas is an example of one such influencer. Thanks to her
57,700 followers, many of whom are under 18 years of age, Zayas joined JUUL's social

---

[33] https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.

[34] http://mediakix.com/2018/08/influencer-definition-marketing/#gs.awBGIprD.

media campaign in September 2017. According to Zayas, her primary appeal to JUUL was that she attracted a younger market. Based on information and belief Zayas was paid $1,000 for a blog post and the Instagram post depicted in Figure 16.



Figure 16: Social Media Influencer
Christina Zayas' JUUL Instagram Post

84.     JUUL's social media influencer campaign was widespread. A two year investigation from 2016 to 2018, led by the Campaign for Tobacco Free Kids, found that cigarette companies, much like JUUL, were paying influencers to post pictures that glamorized smoking. The investigation also found that companies guided influencers on how to take photos, what hashtags to include, and when to post them to increase their visibility.[35]

85.     JUUL's posts were misleadingly presented without disclosure that JUUL was paying the party making the post. As a result, JUUL's target audience were misled into thinking that these attractive and popular people actually used and

---

[35] https://www.takeapart.org/wheretheressmoke/#introduction.

were endorsing JUUL products, when in fact, the posts were bought and paid for by JUUL.

86.     Along with paid social media influencers, JUUL also posted advertisements and news stories about famous Hollywood celebrities using their products.[36] For instance, JUUL used its social media accounts to promote images of Katy Perry with a JUUL. By tagging Katy Perry in social media posts (*see* Figure 17), JUUL was able to introduce and promote its product to Ms. Perry's 107,000,000 Twitter followers. Ms. Perry appeals to a very youthful audience.



*Figure 17: Katy Perry Images with JUUL*

87.     While JUUL's competitors spent over of $16 million between 2015 and 2016 on traditional advertising, JUUL spent only $2.1 million between 2015 and 2017 and instead relied on the above-referenced social media strategy. As shown in Figure 18, JUUL continued to heavily rely on its social media strategy as time went on with the number of JUUL-related tweets increasing from 8,416 in 2015, to 21,292 in 2016,

---

[36] https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-JUULs-early-marketing-campaigns/#3a1f4dc14f9c.

to 366,786 in 2017.



*Figure 18: Number of JUUL-Related Tweets (2015-2017)*

88.    The marketing strategy worked. As shown in Figure 19, JUUL outperformed its competitors from inception, and as time went on, did so exponentially.



*Figure 19: Total Sales of E-Cigarettes Among Largest Manufacturers (2011-2017)*

89.     Notwithstanding its knowledge about the decades of litigation and regulation relating to the marketing of nicotine-infused products, JUUL persisted with its online marketing efforts until finally shutting down its social media sites in November 2018, approximately three years after its launch.

###### iii.     *Other marketing techniques directed to youth*

90.     As discussed above, JUUL minimally used traditional marketing channels such as magazines, newspapers, billboards, radio, and television. In 2015, however, JUUL utilized a single magazine to launch its advertising campaign – *Vice*. *Vice* markets itself as the "#1 youth media company" with "a mission to empower young people," and promotes its print magazines as "defining global youth culture."[37] JUUL ran a full page spread in *Vice* magazine using young models in playful poses:



*Figure 20: JUUL's Vice Magazine Advertisement*

---

[37] https://kit.vice.com.

91.     Also as part of its 2015 launch, JUUL took over massive, brightly colored, 12-unit billboards in Times Square. The displays flashed images of attractive and fashionably causal young models smiling and kissing while enthusiastically vaping. Examples of JUUL's Times Square billboards are depicted in Figure 21.






*Figure 21: JUUL's 2015 Times Square Billboard Advertisements*

92.     Again, while American tobacco companies agreed to stop using billboards in 1999, JUUL has exploited the practice.

93.     As if the youth targeted marketing was not enough, for months JUUL's

41

website entrapped underage visitors through deceptive and faulty age verification techniques. To access and browse JUUL's website initially, an individual needed only click on a box, pledging they were of age and the website was open for use.

94. Now, in order to purchase a product from JUUL's website, an individual has to create a profile and pass a background check by providing his or her birthday and the last four digits of their social security number. If the person was not old enough, the site would deny access. However, even if they were denied access, JUUL would still add minors to its email listserv such that these interested minors would receive advertisements and notifications on promotional campaigns for new fruity flavors and large discounts off JUUL's $49.99 starter kit.

iv. *JUUL's design and use of flavored vapor is intended to appeal to minors*

95. The design of the JUUL is similar to a flash drive. It is discrete in size, shape, and emits a reduced odor – all of which makes it more appealing to youth users. JUUL's website once touted the JUUL as "the i-Phone of E-cigs," framing the device as cool, hip, fashionable, and more appealing for children and minors to own and use.

96. While a pack of cigarettes contains 20 cigarettes that each need to be lit separately, JUUL can be inhaled continuously and often can be used indoors without detection by others, thus eliminating the need for smoking breaks (a feature

promoted heavily in its advertisements). The design makes it easy to conceal and use without authority figures such as teachers, principals, and parents noticing.[38]

97.     JUUL products are also priced to appeal to adolescents, as one pack of four JUUL pods is almost as cheap as a single pack of cigarettes. A pack of four JUUL pods, which, according to JUUL is the equivalent of four packs of cigarettes, costs approximately $15.99 on the JUUL website. By contrast, a single pack of cigarettes in Chicago costs approximately $12.00.

98.     Further, unlike traditional cigarettes which can be irritating and cause an unpleasant feeling in the chest and lungs, JUUL's use of nicotine salt makes the vapor go down smoothly.[39]

99.     Along with its social media and advertising blitz, JUUL markets and sells its JUUL pods in a variety of sweetened flavors that appeal to youth, which then "hooks" underage "vapers."[40] As shown in Figure 22, JUUL promoted its flavored nicotine pods through social media and traditional marketing platforms.

  

---

[38] https://www.ncbi.nlm.nih.gov/pubmed/30219794.

[39] https://www.vox.com/science-and-health/2018/5/1/17286638/JUUL-vaping-e-cigarette.

[40] https://abcnews.go.com/Nightline/video/JUULing-trendy-vape-pen-popular-teens-56192940.



*Figure 22: JUUL Pod Flavor Marketing*

100.    JUUL pods are offered in both 5% nicotine and 3% for select flavors. All of the non-traditional, more appealing, adolescent-friendly flavors, such as Mango, Cucumber, Crème, and Fruit are *only* offered in 5% Nicotine strength.

101.    Researchers have stated that JUUL's emphasis on sweet flavors directly appeals to youth, a demographic who largely might never use tobacco products.[41] According to a 2013-2014 survey (a survey which JUUL would have had access to prior to its launch), 81% of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.

102.    While the FDA banned flavored cigarettes other than menthol – such as cherry, chocolate, etc. – in 2009, JUUL has exploited the practice which it knows appeals to youth.[42]

---

[41] https://www.businessinsider.com/stanford-JUUL-ads-photos-teens-e-cig-vaping-2018-11

[42] https://www.fda.gov/tobaccoproducts/labeling/productsingredientscomponents/ucm2019416.htm

103.   The United States Department of Health and Human Services Secretary, Alex Azar, stated, "Flavors are a major reason [high school and middle school students] use these products in the first place."[43]

### D.   The FDA's recognition that JUUL Targets Minors and JUUL's Insufficient Response

104.   In April 2018, after growing concern of the popularity of e-cigarettes with children, the FDA demanded that JUUL turn over documents about the marketing and research behind its products and stated that it would investigate whether JUUL was intentionally appealing to the youth market.[44] In announcing the investigation, the FDA explained:

> We need to examine all the available information to understand why kids are finding these products so appealing – and address it. That's why today, the FDA also sent an official request for information directly to JUUL Labs, requiring the company to submit important documents to better understand the reportedly high rates of youth use and the particular youth appeal of these products. The information we're requesting includes: documents related to product marketing; research on the health, toxicological, behavioral or physiologic effects of the products, including youth initiation and use; whether certain product design features, ingredients or specifications appeal to different age groups; and youth-related adverse events and consumer complaints associated with the products. We don't yet fully understand why these products are so popular among youth. But it's imperative that we figure it out, and fast. These documents may help us get there.[45]

105.   In September 2018, the FDA issued a letter to JUUL threatening to pull its products from the market if it did not submit plans within 60 days describing how

---

[43] https://www.usatoday.com/story/news/health/2018/11/15/fda-ban-vaping-flavors-electronic-cigarettes-menthol-cigars-scott-gottlieb/2003219002/

[44] https://www.nytimes.com/2018/04/24/health/fda-e-cigarettes-minors-JUUL.html?module=inline

[45] https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulationsGuidance/UCM605490.pdf.

it will address the widespread youth access and use of their products.[46] The FDA issued more than 1,300 warning letters and civil fines to retailers and distributors who illegally sold e-cigarette products to minors.[47]

106.   On November 15, 2018, Scott Gottlieb (the FDA Commissioner at the time) acknowledged that "[g]iven the startling and disturbing youth use rates . . . it's clear that [the FDA] must do more . . . to target what appear to be the central problems – youth appeal and youth access to flavored tobacco product."[48]

107.   Since the FDA initiated its investigation, JUUL has tacitly admitted wrongdoing. Ashley Gould, the chief administrative officer for JUUL, stated, "[w]e have to take ownership for what was done in the past . . . Could we have done things different in the past? Yes."[49] Separately, a former senior manager at JUUL told The New York Times that the company was "well aware" its devices could appeal to teens and that teens were posting images of themselves vaping with JUULs on social media.[50]

108.   Further responding to the FDA's investigation in November 2018, JUUL "shutdown" its social media presence. However, JUUL's Instagram account still has 86,500 followers and contains hyperlinks to the JUUL company website. Moreover, the social media presence created by JUUL relies heavily on consumers' active

---

[46] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620184.htm

[47] https://www.cdc.gov/mmwr/volumes/67/wr/mm6745a5.htm?s_cid=mm6745a5_w

[48] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access

[49] https://www.businessinsider.com/JUUL-e-cig-startup-marketing-appealed-to-teens-2018-7

[50] https://www.nytimes.com/2018/08/27/science/JUUL-vaping-teen-marketing.html

involvement, which persists to this day. There remain over 335,000 posts using the JUUL created "#JUUL" hashtag and over 30,000 posts using #JUULnation.

109.   In November 2018, JUUL also promised that it would stop sales of fruit-flavored nicotine pods in retail stores. To date, however, JUUL flavored pods remain widely available.

110.   In terms of marketing, JUUL redefined its mission from creating a "luxury" product that appealed to youth to a smoking cessation device. JUUL removed many of the internet images depicting glamorous young models seductively exhaling clouds of vapors. Instead, JUUL's website now depicts middle-aged adults in non-glamorous settings and suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative to traditional tobacco products. Of course, JUUL's well-documented history clearly demonstrates that this was never its true mission.

111.   Moreover, Ari Atkins, a JUUL research and development engineer, said before JUUL's launch in 2015, "[w]e don't think a lot about addiction here because we're not trying to design a cessation product at all."[51]

112.   Not only is JUUL's attempt to distance itself from its wrongful conduct disingenuous, it is superficial. JUUL's e-cigarettes are still as addictive as they ever were, are still sold in candy-like flavors, can still be ordered with a subscription

---

[51] https://www.washingtonpost.com/news/to-your-health/wp/2018/07/30/e-cigarette-maker-juul-targeted-teens-with-false-claims-of-safety-lawsuit-claims/?utm_term=.60d5bcb180db

service on JUUL's website, and JUUL continues to hide the truth about the actual

nicotine content and addictiveness of its devices.

### E.   United States Congressional Finding that JUUL Recruited and Targeted Youth

113.   According to a July 25, 2019 report by United States Congressional

Subcommittee of Economic and Consumer Policy, JUUL "deliberately targeted

children in order to become the nation's largest seller of e-cigarettes."[52]

114.   The Subcommittee's findings were based on approximately 55,000 non-

public JUUL documents showing that:

   a.   JUUL operated a program in which they paid schools for access to student class rooms and programs in which JUUL's messaging was that their product was "totally safe";

   b.   JUUL targeted teenagers by buying access to out-of-school programs and set up summer camps to recruit children as young as third graders; and

   c.   JUUL used a sophisticated and high-cost social media influencer program to promote online marketing to youth. *Id.*

### F.   JUUL's Transition from Targeted Marketing Efforts to Fraudulent Cessation Claims

115.   FDA rules prohibit e-cigarette companies from:

   a.   claiming their product is less harmful than other tobacco products without providing substantiation to the FDA and receiving FDA's authorization that their product is indeed a modified risk tobacco product.

---

[52] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf

> b.  making cessation claims without submitting a medicinal
>     product application to FDA's Center for Drug and
>     Evaluation Research and receiving FDA authorization.[53]

116.   JUUL is in direct violation of FDA rules. JUUL markets its product as safer than traditional cigarettes and as smoking cessation devices, yet it has neither participated in any FDA approval process nor received FDA approval as either a modified risk tobacco product or as a nicotine replacement therapy.

117.   In fact, the FDA has found no evidence that JUUL provides cessation benefits: "[t]here is no evidence to date that e-cigarettes are effective cessation devices . . . the number of cigarette smokers who actually quit tobacco product use with e-cigarettes is low." [54]

118.   Despite being in direct violation of FDA rules, JUUL continues to market itself as a cessation device without FDA approval and is not even being made to apply for FDA approval until *August 2022*.

119.   As such, JUUL continues to urge smokers to switch to JUUL through its "Switch" campaign (*see* Figure 23). The tacit message being "switch because, unlike cigarettes, JUUL is harmless to your health."

---

[53] 21 C.F.R. § 1100, 1140, and 1143 (2016).

[54] https://tobacco.ucsf.edu/sites/tobacco.ucsf.edu/files/u9/FDA-comment-2014-06-02%20Ecigarette%20marketing%20cessation%20messages%20deeming%20rule-1jy-8cgs-l1sq.pdf.



*Figure 23: Posted Instagram Images from JUUL's "Switch" Campaign*

120. The Switch campaign further suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker. For example, as depicted in Figure 24, JUUL tweeted an image and quote from a JUUL user whose entire family smoked traditional tobacco products prior to "switching to JUUL" where he suggests he is permanently "staying."



*Figure 24: Posted Instagram Images
from JUUL's "Switch" Campaign*

121. Multiple studies, however, contradict JUUL's claims:

    a. One longitudinal population study of adult smokers in four countries (including the United States) found that e-cigarette

use was not significantly associated with quitting conventional cigarettes.[55]

    b. In another longitudinal study of smokers in the United States, there was no relationship between e-cigarette use and quitting tobacco cigarettes after one year's time.[56]

    c. A third longitudinal study of young adults in the United States also found that e-cigarette use did not predict quitting smoking after one-year follow-up.[57]

    d. A fourth longitudinal study of quit-line users in the United States actually found that e-cigarette users were *less* likely to have quit smoking than non-e-cigarette users at 7-months follow-up.[58]

122. As JUUL's cessation claims relate to minors, one study found that adolescents who use e-cigarettes are ***more*** likely to become traditional tobacco cigarette smokers than their peers who do not use e-cigarettes:

    a. Eighth grade students who use e-cigarettes are ten times more likely than their peers who do not use e-cigarettes to eventually smoke tobacco cigarettes.

    b. Tenth grade students who use e-cigarettes are eight times more likely than their peers who do not use e-cigarettes to eventually smoke tobacco cigarettes.

---

[55] Adkison et al, 2013, Electronic nicotine delivery systems: International tobacco control four-country survey. *American Journal of Preventive Medicine*, 44(3):207-215.

[56] Grana RA, Popova L, Ling PM. A longitudinal analysis of electronic cigarette use and smoking cessation. *JAMA Internal Medicine*. 2014;174(5):812-813.

[57] Choi, K., Forster, L, 2014. Response to Letter to the Editor Regarding "Beliefs and Experimentation with Electronic Cigarettes: A Prospective Analysis Among Young Adults." *American Journal of Preventive Medicine*, 46 (6): e58-359.

[58] Vickerman et al, 2013; Use of electronic cigarettes among state tobacco cessation quitline callers. *Nicotine Tob Res*, 15 (10): 1787-1791.

    c.  Twelfth grade students who use e-cigarettes are six times more likely than their peers who do not use e-cigarettes to eventually smoke tobacco cigarettes. [59]

**G.    JUUL's Effects on E-Cigarette Usage Among Minors in Illinois and Lake County**

123.   There are currently over two million students enrolled in pre-kindergarten through high school in public and private schools throughout Illinois. The unfortunate success of JUUL's early marketing campaign has lasting effects on this population that will continue.

124.   For instance, despite the recently included warnings on JUUL packaging, approximately two-thirds of JUUL users aged 15-24 do not know that JUUL pods contain nicotine.[60]

125.   While traditional cigarette use among Illinois minors has been steadily declining for years, e-cigarette usage between 2016 and 2018 has increased by 15% among 8th graders, 65% increase in 10th graders, and 45% among 12th graders.[61] (note, e-cigarette usage was not even tracked in Illinois prior to 2016).

126.   In 2018, only 1% of Illinois 8th graders, 2% of 10th graders, and 9% of 12th graders reported any cigarette usage in the past 30 days. When asked about e-cigarettes however, those percentages rose to 7%, 18%, and 27%, respectively. *Id.*

---

[59] https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html

[60] https://truthinitiative.org/news/JUUL-e-cigarettes-gain-popularity-among-youth.

[61] https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/state-reports/2016/Freq16_IYS_Statewide.pdf;
https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/state-reports/2018/Freq18_IYS_Statewide.pdf.

127. As for Lake County, from 2014 to 2018, traditional cigarette usage declined by 300% among 8th graders, 100% among 10th graders, and 71% among 12th graders. By 2018, only 1%, 3%, and 7% of 8th, 10th, and 12th graders reported smoking cigarettes.[62]

128. E-cigarette usage, however, was 800%, 733%, and 471% higher than traditional cigarette usage among each respective population. *Id.*

129. Between 2016 and 2018, those who reported using e-cigarettes within the past 30 days increased 40% among 8th graders, 82% among 10th graders, and 72% among 12th graders (again, e-cigarette usage was not tracked in Lake County, Illinois prior to 2016). *Id.*

130. Of the Lake County youth surveyed who admitted to using e-cigarettes in 2016, 18% of 10th graders and 22% of 12th graders reported using e-cigarettes more than once per day. For comparison, 0% reported using cigarettes more than once per day. *Id.*

131. By 2018, those reporting e-cigarette usage more than once per day rose to 25% among Lake County 10th graders and 35% among Lake County 12th graders, demonstrating a significant increase in prolonged addictive behavior. *Id.*

132. Moreover, the number of Lake County 10th and 12th graders who reported using cigarettes more than once per day was still 0% in 2018, demonstrating

---

[62] https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/2014/cnty14_lake.pdf;
https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/2016/Cnty16_Lake.pdf;
https://iys.cprd.illinois.edu/UserFiles/Servers/Server_178052/File/2018/Cnty18_Lake.pdf

that this increase in e-cigarette usage was *not* the result of minors converting to e-cigarettes, but instead, that new users were picking up the habit.

133.   In response to these staggering numbers:

a.   The National Institute on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance recording in 44 years;

b.   FDA Commissioner, Dr. Scott Gottlieb, has stated that the data "shock[s] [his] conscience" and repeatedly referred to the growing rate of e-cigarette use among adolescents and teens as an epidemic; and

c.   On December 18, 2018, the U.S. Surgeon General called the e-cigarette an epidemic among youth and singled out JUUL, the most popular electronic cigarette among young people, for fueling the epidemic.[63]

134.   This increased usage among Lake County youth has led to additional burdens on Lake County.

135.   Individual Lake County schools report confiscating an average of 56 e-cigarettes per year.

136.   Minors who are caught with e-cigarettes receive in-school suspensions, Saturday detentions, are placed social probation programs, and are required to attend meetings with health department representatives.

137.   Lake County schools have been forced to hire private agencies to implement new education programs relating to e-cigarette usage.

138.   The Lake County Health Department has also been tasked with abating e-cigarette usage among the youth, including offering private and group counseling

---

[63] https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vaping-is-now-an-epidemic.

(at $75-$150 per session) and providing nicotine replacement therapies to its addicted population.

139.    On an individual basis, experts charge approximately $16,000 for 30-day inpatient treatment for nicotine addiction. Year-long outpatient treatments cost approximately $30,000.

## FIRST CAUSE OF ACTION
### Violation of Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1, *et seq.*
### (On Behalf of Plaintiff People of the State of Illinois Against JUUL)

140.    Plaintiff People of the State of Illinois incorporates the foregoing allegations as if fully set forth herein.

141.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, et seq. ("ICFA"), provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration should be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

142.    While conducting trade or commerce, JUUL has engaged in the following conduct constituting a deceptive act or practice declared unlawful under Section 2 of the ICFA:

a. Making deceptive fraud, false promises of material fact, and/or misrepresentations of material fact including, but not limited to, the following:

   i. Misrepresenting JUUL products as non-addictive nicotine delivery systems or less-addictive nicotine delivery systems than traditional cigarettes;

   ii. Misrepresenting the absorbed nicotine level for the use of JUUL products;

   iii. Misrepresenting JUUL as safer and less addictive than traditional cigarettes;

   iv. Misrepresenting the health benefits of switching from using traditional cigarettes to JUUL products;

   v. Misrepresenting the use of JUUL products as a way to quit using traditional cigarettes or to quit smoking in general;

   vi. Misrepresenting the concentration of nicotine salt containing absolute nicotine concentration of at least 1.2% higher than as stated;

   vii. Misrepresenting the nicotine content of JUUL pods by representing it as 5% strength;

   viii. Misrepresenting that a JUUL pod contains as much nicotine as a pack of cigarettes when the amount consumed via a JUUL pod is as much as twice as high as traditional cigarettes; and

   ix. Misrepresenting the nicotine content of JUUL pods as the same as a pack of cigarettes when the nicotine content is closer to 24 cigarettes or at least 20% more than one pack.

b.  Concealing and/or suppressing material facts by:

i.  Failing to disclose the chemicals contained in JUUL products;

ii.  Failing for years to disclose that JUUL products contain any addictive chemicals;

iii.  Failing to disclose the adverse health effects of using JUUL products including, but not limited to, increased risk of heart disease and stroke, changes in brain functionality that lead to susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system, heightened risk of cancer and negative effects on fertility;

iv.  Failing to disclose that JUUL products deliver higher amounts of nicotine at a faster rate than a traditional cigarette;

v.  Failing to disclose that because of JUUL's method of nicotine absorption, JUUL's nicotine solution is more addictive than traditional cigarettes even with lower concentrations;

vi.  Failing to disclose that JUUL's nicotine salts increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes;

vii.  Failing to disclose that JUUL's nicotine salt formulation delivers an exceptionally potent dose of nicotine;

viii.  Failing to disclose that the efficiency with which JUUL devices deliver nicotine into the bloodstream increases its addictiveness; and

ix.  Failing to disclose that non-smokers who then use JUUL products have a significant likelihood of using traditional cigarettes.

      c. Misrepresenting the product as having the characteristics, ingredients, uses, and benefits they do not have and engaging in conduct which creates a likelihood of confusion or misunderstanding.

143. JUUL marketed a product that contained nicotine levels far in excess of what smokers need to comfortably switch from cigarettes with the intention of creating and fostering long-term addition to JUUL products.

144. JUUL falsely and deceptively marketed, advertised, and sold JUUL products by misrepresenting their nicotine content, nicotine pharmacokinetics, and suitability as an alternative to cigarettes, and falsely implied that they were useful as a smoking or nicotine-use cessation device.

145. JUUL falsely and deceptively advertised its products in a manner that lured underage smokers and non-smokers into using JUUL products.

146. JUUL committed the deceptive acts and unfair practices with the intent that minors would rely upon the deceptive acts and unfair practices.

147. JUUL's deceptive acts and unfair practices occurred in the course of conduct involving trade or commerce.

148. JUUL's deceptive acts and unfair practices have violated and continue to violate the deceptive prong of the Illinois statutes because they extend to transactions that are intended to result, or which have resulted, in the sale or distribution of goods or services to consumers.

149. JUUL's deceptive acts and unfair practices occurred through its advertising, offering for sale, and sale or distribution of merchandise for cash or on credit.

150. Minors in Illinois have seen the advertisements in JUUL's long, pervasive advertising campaign and were exposed to the false messages conveyed by the campaign.

151. As described above, each of JUUL's advertisements share common elements that are designed specifically to resonate with minors, including the use of attractive young women in suggestive poses, romance, and social inclusion to convey the idea that the products would make one hip and attractive, and the use of flavors, relaxation, new technology, and select terms to depict the products as healthy and safe. A representative sample of these advertisements has been included throughout this complaint.

152. JUUL's conduct offends public policy, is immoral, unethical, oppressive, and unscrupulous.

153. JUUL's deceptive acts and unfair practices proximately caused actual damages and substantial injuries to consumers.

154. The State of Illinois has and will continue to sustain damages the amount of which will be determined at trial.

155. Pursuant to 815 ILCS 505/7(b), the penalty for violating the ICFA is a sum not to exceed $50,000, or, if the Court finds that JUUL's above-described practices were intended to defraud Illinois residents, $50,000 per violation.

156.   Unless and until enjoined and restrained by order of this Court, JUUL will continue to cause injury to Plaintiff and the loss of money and property in that JUUL will continue to violate the laws of Illinois, unless specifically ordered to comply with the same.

## SECOND CAUSE OF ACTION
### Negligence
### (Lake County, Illinois and Michael G. Nerheim, as State's Attorney of Lake County, Illinois Against JUUL)

151.   Plaintiffs Lake County, Illinois and Michael G. Nerheim, as State's Attorney of Lake County, Illinois, incorporate the foregoing allegations as if fully set forth herein.

152.   At all relevant times, JUUL owed the citizens of the State of Illinois a duty to:

a.   Exercise reasonable care in the marketing of its products;

b.   Exercise reasonable care in ensuring its products are not sold and/or distributed to minors and are not designed or advertised in a manner that makes them unduly attractive to minors;

c.   Use reasonable and adequate procedures that are compliant with industry-standard practices in ensuring that distributors and/or retailers of its products do not sell and/or distribute them to minors;

d.   Implement processes to quickly detect whether its products are sold and/or distributed to minors and to timely act on this information to eliminate the sale and/or distribution of the products to minors;

e.   Communicate accurate information;

f.   Not create a foreseeable risk of harm to minors; and

60

g. Comply with the Prevention of Tobacco Used by Minors and Sale and Distribution of Tobacco Products Act, 725 ILCS 675/0.01 *et seq.*

153. JUUL breached one or more of the above duties by:

a. Engaging in minor-based marketing to target minors;

b. Marketing the products as safe, candy-like products to which minors are attracted when in fact they contain more potent doses of nicotine than cigarettes, which make them particularly addictive;

c. Marketing the products as a healthy and fun activity as opposed to a means of delivering potent and addictive doses of nicotine;

d. Permitting the implementation of inadequate systems, protocols, and practices by itself and by its distributors and retailers that allowed minors to purchase and/or receive the products, thereby creating a foreseeable risk of harm;

e. Inducing the purchase of the products by minors through marketing its products to minors through the use of viral social media campaigns and fostering a cool, youthful image;

f. Failing to comply with the minimal industry standards with respect to its distributors and retailers;

g. Failing to take timely, affirmative steps to eliminate the sale and/or distribution of e-cigarettes to minors when it knew minors were purchasing, receiving and/or using its products;

h. Making the false statements by:

    i. Misrepresenting JUUL products as non-addictive nicotine delivery systems or less-addictive nicotine delivery systems than traditional cigarettes;

    ii. Misrepresenting the absorbed nicotine level for the use of JUUL products;

      iii.    Misrepresenting JUUL as safer and less addictive than traditional cigarettes;

      iv.    Misrepresenting the health benefits of switching from using traditional cigarettes to JUUL products;

      v.    Misrepresenting the use of JUUL products as a way to quit using traditional cigarettes or to quit smoking in general;

      vi.    Misrepresenting the concentration of nicotine salt containing absolute nicotine concentration of at least 1.2% higher than as stated;

      vii.    Misrepresenting the nicotine content of JUUL pods by representing it as 5% strength;

      viii.    Misrepresenting that a JUUL pod contains as much nicotine as a pack of cigarettes when the amount consumed via a JUUL pod is as much as twice as high as traditional cigarettes; and

      ix.    Misrepresenting the nicotine content of JUUL pods as the same as a pack of cigarettes when the nicotine content is closer to 24 cigarettes or at least 20% more than one pack.

i.  Making omissions or concealments by:

      i.    Failing to disclose the chemicals contained in JUUL products;

      ii.    Failing for years to disclose that JUUL products contain any addictive chemicals;

      iii.    Failing to disclose the adverse health effects of using JUUL products including, but not limited to, increased risk of heart disease and stroke, changes in brain functionality that lead to susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system, heightened risk of cancer and negative effects on fertility;

iv.  Failing to disclose that JUUL products deliver higher amounts of nicotine at a faster rate than a traditional cigarette;

v.  Failing to disclose that because of JUUL's method of nicotine absorption, JUUL's nicotine solution is more addictive than traditional cigarettes even with lower concentrations;

vi.  Failing to disclose that JUUL's nicotine salts increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes;

vii.  Failing to disclose that JUUL's nicotine salt formulation delivers an exceptionally potent dose of nicotine;

viii.  Failing to disclose that the efficiency with which JUUL devices deliver nicotine into the bloodstream increases its addictiveness; and

ix.  Failing to disclose that non-smokers who then use JUUL products have a significant likelihood of using traditional cigarettes

j.  Engaging in affirmative conduct that creates an unreasonable risk of harm and then failing to exercise reasonable care to prevent the harm.

154.  JUUL's false statements, omissions, and/or concealments were of past or existing material facts which were essential elements to the transaction.

155.  JUUL made the false statements and omissions and/or concealments without reasonable grounds for believing the statements to be true and with carelessness in ascertaining the truth of the statements.

156.   JUUL made the false statements and omissions and/or concealments with the intent to induce the reliance by minors on the false statements, omissions and/or concealments.

157.   JUUL did not act reasonably.

158.   JUUL knew or should have known the likelihood that minors would be attracted to its products and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

159.   JUUL knew or should have known that its marketing, distribution, and/or sales practices did not adequately safeguard minors from the sale and/or distribution of the products and, in fact, induced minors to purchase the products.

160.   JUUL was negligent in that it knew, or by the exercise of reasonable care, should have known that its products under ordinary use were harmful or would cause injury to minors but failed to use reasonable care to warn minors of the potentially harmful and injurious effects in a manner that a reasonable person would do so under the same or similar circumstances.

161.   The minors acted reasonably and justifiably in relying on the truth of the misrepresentations made by JUUL as the minors were not aware and would not have recognized the risk of using JUUL's products because JUUL intentionally downplayed, misrepresented, concealed, and failed to warn of the risks of nicotine exposure and addiction that the products posed.

162.   The minors were particularly unable to appreciate the risk because of their youth, inexperience, and/or immaturity of judgment.

163.   If the minors had been aware of the truth, the minors would have acted differently.

164.   The Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act was intended and designed to protect human life or property.

165.   The Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act provides that a person, either directly or indirectly by an agent, employee, or by a vending machine owned by the person or located in the person's establishment may not sell, offer for sale, give or furnish any alternative nicotine product, or any cartridge or component of an alternative nicotine product, to a person under 18 years of age.

166.   JUUL has violated Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act by selling, offering to sell, giving, or furnishing its products to people under 18 years of age.

167.   The minors are members of the class of people that the Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act was intended to protect.

168.   The Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act provides for punishment.

169.   The violations caused by Defendant is the kind of harm the Prevention of Tobacco Use by Minors and Sale and Distribution of Tobacco Products Act.

170.   As a result of all of the above, the State of Illinois has and will continue to sustain damages and injuries in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
Unjust Enrichment
(Lake County, Illinois and Michael G. Nerheim, as State's Attorney of Lake
County, Illinois, Against JUUL)

171.   Plaintiffs Lake County, Illinois and Michael G. Nerheim, as State's Attorney of Lake County, Illinois, incorporate the foregoing allegations as if fully set forth herein.

172.   As a direct and proximate result of JUUL's misconduct set forth above, the minors in the State of Illinois have conferred benefits and enrichments upon JUUL whereby JUUL has been unjustly enriched.

173.   By its misconduct as described above, JUUL has accepted a benefit to the detriment and harm and expense to the minors in the State of Illinois and hence, the State of Illinois.

174.   JUUL has and continues to knowingly retain wrongful benefits and funds in relation to the harm to the minors in the State of Illinois and hence, the State of Illinois.

175.   JUUL has retained these benefits under circumstances where it would be unjust to do so.

176.   JUUL's acceptance of the benefits and retention of monies paid violated the fundamental principles of justice, equity, and good conscience and have unjustly enriched Defendant.

177.   It is inequitable for JUUL to be permitted to retain the benefits it received without justification in an unfair, unconscionable, and oppressive manner. Such retention of funds under such circumstances make it inequitable and constitute

unjust enrichment.

178.   As a direct and proximate results of the foregoing, the State of Illinois has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### Declaratory and Injunctive Relief
### (On Behalf of the People of the State of Illinois, Lake County, Illinois, and Michael G. Nerheim, as State's Attorney of Lake County, Illinois, Against JUUL)

179.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

180.   Pursuant to 735 ILCS 5/2-701, this Court "may make binding declarations of rights, having the force of final judgments . . . including the determination . . . of the construction of any statute, municipal ordinance, or other governmental regulation . . . and a declaration of the rights of the parties interested."

181.   Such a declaration of rights "may be obtained . . . as incident to or part of a complaint . . . seeking other relief as well." 735 ILCS 5/2-701(b).

182.   Plaintiff People of the State of Illinois seeks a judgment declaring that JUUL has violated the ICFA.

183.   Unless and until enjoined and restrained by order of this Court, JUUL will continue to cause injury to Plaintiffs and the loss of money and property in that JUUL will continue to violate the laws of Illinois, unless specifically ordered to comply with the same.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order granting the following relief:

A.    Declaring that JUUL's actions constitute violations of the ICFA;

B.    Fining JUUL $50,000 for violating the ICFA or, if the Court finds that JUUL engaged in the above-described conduct with intent to defraud, $50,000 for each such violation;

C.    Awarding the greater of actual or compensatory damages according to proof;

D.    Awarding monetary award, abatement, and equitable, and/or injunctive relief in the form of a court-enforced and supervised fund and corrective action, programs, communications and other appropriate relief to restore the public health, safety, peace, and honest marketplace, which will require, at least, the following:

1. Funding and programs for health care services and programs associated with the early detection, ongoing testing, monitoring for detection of illness, disease process, or disease, diagnosis and treatment of resulting injuries and adverse health consequences of JUUL's conduct;

2. Funding and programs to combat the abuse and diversion of the use of e-cigarettes by minors including tobacco education programs, cessation programs for users, and public information campaigns to warn users of health effects and addictive nature of the product;

3. Funding, programs, studies, and research of the short and long-term effects of e-cigarette use in minors and the possible cures and treatments for the detrimental effects of using it;

4. Funding and programs for accumulating and analyzing relevant medical and demographic information from underage users, including the results of testing and diagnosis; and

5. Funding the police, prosecution, correction, and other services and costs associated with the harm done by JUUL to the public health and safety.

E.     Awarding punitive damages;

F.     Awarding forfeiture, disgorgement, restitution, rescission, and divesture of JUUL's proceeds and assets;

G.     Awarding injunctive relief including an injunction against JUUL from continuing to perform its wrongful conduct;

H.     Awarding declaratory relief including a declaration that JUUL's practices constitute false, misleading, and deceptive advertising;

I.     Awarding Plaintiffs' reasonable attorneys' fees and costs;

J.     Awarding Plaintiffs pre- and post-judgment interest, to the extent allowable;

K.     Awarding such and other injunctive and declaratory relief as is necessary; and

L.     Awarding such other and further relief as the Court deems reasonable and just.

Dated: August 13, 2019                    Respectfully Submitted,

                                          /s/ _____
                                          *Attorneys for the State of Illinois*
                                          Michael G. Nerheim #6271365
                                          State's Attorney of Lake County,
                                          Illinois

69

Antonio Romanucci (ARDC 6190290)
Robert Baizer (ARDC 0095710)
Joseph Kolar (ARDC 6191777)
David Nieman (ARDC 6300412)
Bryce Hensley (ARDC 6327025)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
rbaizer@rblaw.net
jkolar@rblaw.net
dneiman@rblaw.net
bhensley@rblaw.net

Steven Hart (ARDC 6211008)
Brian Eldridge (ARDC 6281336)
Carter Grant (ARDC 6306058)
John (Jack) Prior (ARDC 6306767)
**HART MCLAUGHLIN & ELDRIDGE, LLC**
22. W. Washington St., Suite 1600
Chicago, Illinois 60602
Tel: (312) 955-0545
Fax: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
cgrant@hmelegal.com
jprior@hmelegal.com

Jay Edelson (ARDC 6239287)
Ben Richman (ARDC 6300668)
Sydney Janzen (ARDC 6324107)
Alfred Murray III (ARDC 6297264)
Ari Scharg (ARDC 6297536)
**EDELSON PC**
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
jedelson@edelson.com
brichman@edelson.com
sjanzen@edelson.com
amurray@edelson.com

ascharg@edelson.com

**FILED**
**8/13/2019 11:56 AM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, ex rel. Michael G. Nerheim, States Attorney of Lake
County, Illinois, LAKE COUNTY, ILLINOIS; MICHAEL G. NERHEIM, as State's Attorney of Lake
County, Illinois,                                    )
                                                     )
                                                     )
                    vs.                              )
                                                     )          19L 00000571 .
                                                     )
JUUL LABS, INC., a Delaware Corporation              )
                                                     )   Gen No. _____

### CERTIFICATE OF ATTORNEY – CIVIL DIVISION

1)   Pursuant to Local Rule 2-2.01(c), I hereby certify that:

■ There has been no previous Voluntary or Involuntary Dismissal of the subject matter of this litigation.

■ There is no other litigation presently pending in the county involving these parties.

☐ There has been a previous Voluntary or Involuntary Dismissal of the subject matter of this litigation and at the time of dismissal that Case No. _____ was assigned to the

Honorable _____

☐ There is other litigation presently pending in the county involving the parties to or subject matter to this lawsuit and that case(s) is/are assigned Case No.(s) _____ which is/are assigned to the

Honorable _____

2)   Are you seeking any injunctive relief?

■ Yes - Select the appropriate case subtype under the Chancery-CH heading below.
☐ No - Select the appropriate non-Chancery case subtype below.

This data is being gathered for administrative purposes and will not be used for any other purpose.

**Arbitration – AR**
☐ Arbitration/Tort
☐ Arbitration/Contract
☐ Foreign Judgment
☐ Other subtype _____

**Chancery – CH**
☐ Residential Mortgage Foreclosure
☐ Residential Mortgage Foreclosure w/Mechanics Lien
☐ Non-Residential Mortgage Foreclosure
☐ Injunction
☐ Specific Performance
☐ Mechanics Lien Foreclosure
☐ Complaint for Rescission
☐ Partition
☐ Quiet Title
☐ Class Action
☐ Structured Settlement
☐ Foreign Judgment
☐ Other subtype _____

**Eminent Domain – ED**
☐ Eminent Domain
☐ Condemnation
☐ Other subtype _____

**Law Magistrate – LM**
☐ Eviction
☐ Eviction as result of mortgage foreclosure
☐ Replevin
☐ Detinue
☐ Distress for Rent
☐ Foreign Judgment
☐ Confirm Arbitrator's Award
☐ Confession of Judgment
☐ Other subtype _____

**Law – L**
■ Tort
☐ Contract
☐ Product Liability
☐ Medical Malpractice
☐ Legal Malpractice
☐ Forcible Entry and Detainer
☐ Replevin
☐ Accounting Malpractice
☐ Foreign Judgment
☐ Confirm Arbitrator's Award
☐ Other subtype _____

**Municipal Corporation – MC**
☐ Annexation
☐ Disconnection
☐ Other subtype _____

**Miscellaneous Remedy – MR**
☐ Declaratory Judgment
☐ Corporation Dissolution
☐ Election Contest
☐ Mandamus
☐ Habeas Corpus
☐ Review of Administrative Proceeding/Statutory
☐ Review of Administrative Proceeding/Certiorari
☐ Quo Warranto
☐ Change of Name
☐ Forfeiture
☐ Fugitive from Justice
☐ Search Warrant
☐ Application for Eavesdropping Device
☐ Foreign Judgment
☐ Non-Attendance of Jurors
☐ Miscellaneous
☐ Other subtype _____

**Tax – TD**
☐ Deeds
☐ Other subtype _____

**Probate – P**
☐ Decedent/Testate > $15,000
☐ Decedent/Intestate > $15,000
☐ Decedent/Testate $15,000 or less
☐ Decedent/Intestate $15,000 or less
☐ Guardianship of Person/ Disabled Person
☐ Guardianship of Estate/ Disabled Person
☐ Guardianship of a Person and Estate/Disabled Person
☐ Guardianship of Person/ Minor
☐ Guardianship of Estate/Minor
☐ Guardianship of Person and Estate/Minor
☐ Proof of Heirship Alone
☐ Foreign Judgment
☐ Other subtype _____

**Tax – TX**
☐ Objections
☐ Disposition of Collections of Judgment of Settlement
☐ Sale in Error
☐ Other subtype _____

Print Name  Brian H. Eldridge   ARDC#6281336  _____

Signature  _____

■ Attorney       ☐ Self-Represented Litigant

171-366 (Rev 7/18)

**FILED**
**8/13/2019 11:56 AM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ex rel. Michael G. Nerheim, State's Attorney of Lake County, Illinois; LAKE COUNTY ILLINOIS; MICHAEL G. NERHEIM, as State's Attorney of Lake County, Illinois,                    Plaintiff(s)<br><br>vs.<br><br>JUUL LABS,INC.,  a Delaware Corporation<br>                                                        Defendant(s) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Gen No: _____

**19L 00000571**

### AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222 (B)

Pursuant to Supreme Court Rule 222 (B), counsel for the above-named plaintiff certifies that plaintiff seeks money

damages in excess of Fifty Thousand and 00/100 Dollars ($50,000).

By

_____

Attorneys for Plaintiff

Prepared by:

Name: Brian H. Eldridge _____ Pro Se ☐

Address: 22 W. Washington Street, Suite 1600

City: Chicago _____ State: IL

Phone: 312.955.0545 _____ Zip Code: 60602

ARDC #: 6281336

Fax: 312.971.9243

E-mail address: beldridge@hmelegal.com

#171-312 (Rev 12/17)

**FILED**
**8/13/2019 11:56 AM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, ex rel. Michael G.
Nerheim, State's Attorney of Lake County, Illinois; LAKE        )
COUNTY, ILLINOIS; MICHAEL G. NERHEIM, as State's              )
Attorney of Lake County, Illinois,                            )
                              Plaintiff(s)     )
              vs.                     )
                                          )
JUUL LABS, INC., a Delaware Corporation                      )
                         Defendant(s)     )

Gen No: _____

19L 00000571

**JURY DEMAND**

The ☒ plaintiff(s) ☐ defendant(s) in the above entitled cause demand a jury for trial of said cause.

_____

Hart McLaughlin & Eldridge, LLC
_____

By: _____
                  Their Attorney(s)/Pro Se

Prepared by:
Attorney's Name: Brian H. Eldridge
Address: 22 W. Washington Street, Suite 1600
City: Chicago                 State: IL
Phone: 312.955.0545       Zip Code: 60602
ARDC: 6281336
Fax: 312.971.9243
E-mail address: beldridge@hmelegal.com

171-109 (Rev 10/13)

Clerk of the Circuit Court Public
Access System

| Search | Contact Us |

Search > Select a Case > Case Number 19L 00000571, PEOPLE OF THE STATE OF ILLINOIS VS JUUL

## Court Case Details

**Case Number:** 19L 00000571

**Case Title:** PEOPLE OF THE STATE OF ILLINOIS VS JUUL

**Case Type:** LAW

**Case SubType:** TORT

**Case Status:** ACTIVE

**Filed Date:** 2019-08-13



| Parties on Case | Judgment | Court Events | Documents Filed |

**FUTURE COURT EVENTS**

| Event Date | Event Time | Courtroom | Event Type |
|------------|------------|-----------|------------|
| 2019-11-12 | 09:00:00 | C303 | 218 CONFERENCE |

**PREVIOUS COURT EVENTS**

| Event Date | Courtroom | Event Type |
|------------|-----------|------------|
| NO PREVIOUS EVENTS SCHEDULED | | |

9/20/2019

**Clerk of the Circuit Court Public Access System**

| Search | Contact Us |
|---|---|

Search > Select a Case > Case Number 19L 00000571, PEOPLE OF THE STATE OF ILLINOIS VS JUUL

## Court Case Details

**Case Number:** 19L 00000571

**Case Status:** ACTIVE

**Case Title:** PEOPLE OF THE STATE OF ILLINOIS VS JUUL

**Filed Date:** 2019-08-13

**Case Type:** LAW

**Case SubType:** TORT

| Parties on Case | Judgment | Court Events | Documents Filed |
|---|---|---|---|

| Filed Date | Document Type | Document Action |
|---|---|---|
| 2019-09-13 | NOTICE OF FILING | E FILED |
| 2019-08-16 | SUMMONS | ISSUED |
| 2019-08-13 | COMPLAINT | E FILED |
| 2019-08-13 | CERTIFICATE OF ATTORNEY | E FILED |
| 2019-08-13 | JURY DEMAND TWELVE | E FILED |
| 2019-08-13 | AFFIDAVIT 222B | E FILED |